v. Omar Rodriguez, No. 2293. May it please the court. My name is Barclay Johnson. I'm an attorney with the Federal Defender's Office in Vermont. And I'm pleased to be here on behalf of Omar Rodriguez. He is a very sick man. Has a very long and complicated medical history. Try to speak right into the microphone a little bit more clearly. Thank you. Yes. It's undisputed that Mr. Rodriguez has end stage kidney disease. He will die if he does not get a kidney transplant. Yet he's got a limited time left before he becomes too sick for a transplant, before kidney disease and heart and his diabetes damages his heart and makes him an unsuitable candidate. Mr. Rodriguez presented expert testimony that made it clear that his last best chance of getting a kidney was outside of the prison in the community where he could get home dialysis, which is a much more natural dialysis process. He wasn't asking to be released immediately. He was just seeking a reduction that would put him home with some opportunity to qualify for a kidney and get a kidney. There were other factors that weighed in favor of a grant here. It was undisputed that he had rehabilitated himself to an unusual degree. He had a nearly spotless disciplinary record. He nearly finished his GED. He had gone from being almost illiterate to someone who was writing his own pleadings and helping others with their pleadings. He had done appropriate programming and had experienced significant personal growth. And it's in this setting that the district court denied the motion, but at least four of the district court's fundamental assumptions underlying its decision were incorrect. Mr. Johnson, before you go through the factual errors, what do we do with, as I read the district court's decision, there was the recitation of findings of fact, and some of which you've challenged. But then I read the district court as saying even if there was an extraordinary, compelling reason to consider release based on the 3553 analysis and the heinousness of the crime, I don't think, I wouldn't exercise the discretion to do that. Does that essentially trump the potential errors in the fact findings in the sense that I don't, did the district court rely on those fact findings in making that determination? I think it did because, and clearly you have to have both parts. It's a two-step process. You need both of them. Neither one is sufficient in and of itself. But the district court in its ruling is clear that saying, and I'm paraphrasing, that even if I were to find extraordinary and compelling circumstances on the information provided to me, and we read that as saying the findings of fact as the court has set them forth and with the errors that we identify. You are saying that in looking at the 3553 factors, the court was saying I look at those factors based on, for the information that has been provided. That's the exact language I believe that was used. And that that information which was provided was incorrect. And therefore, we cannot say for sure that the court would have ruled under 3553 as it in fact did. Not that the information was incorrect, but the district court overlooked or misunderstood parts of it as we have set forth. The court believed that he had not been in the hospital and he was in the hospital. There were any number of errors at that previous part. Yes. That most clear one was that of being in the air. But the question is, did that affect the 3553? And the only link is this statement about the information given. I think not, Your Honor. I think because the district court has to consider the 3553A factors that are relevant, one of them is the need to provide the defendant with medical care in the most effective manner. We don't expect courts to mechanically go through every single argument, but that was certainly one of the prominent arguments here. An expert testified at the hearing. Is that a 3553 factor? It is. It's one of the last ones on the list. It's often overlooked, but it certainly is there, the need to provide the defendant with educational, vocational, medical care in the most effective manner. The court didn't address that. So we have the statement that on the information provided, I am making this conclusion. But then we have the absence of this one major point that Mr. Rodriguez was arguing. So what would you have us do? Send it back to the district court for a Jacobson remand saying, you made these mistakes in your original question of whether a person would be eligible. Now decide, tell us what you would do on 3553. Would that correct it? I think that's a possibility, but I think that really the better path would be just remand it for a new consideration, both on the extraordinary and compelling factor and 3553A. Can we talk about, I cut you off and I'm sorry about that, the individual errors. I wonder, so the recent hospitalizations point, much of your brief talks about various outpatient visits to the hospital. At least I understood the finding or the statement that is objected to. It involved prolonged hospitalizations. So I'm trying to figure out whether there's any relevance to how many times you went to the hospital for day trips, essentially, for appointments during that two year period. Does that have any bearing on whether that finding is correct? I think it does. I think it is relevant both to the idea that the judge overlooked the hospitalizations at all, because there was so much of it. And it also goes to whether, I think my time has expired, but if I can just finish, whether the care at FMC Devens is adequate. The fact that he needs to leave there so often to go either for inpatient treatment or for visits suggests that FMC Devens is not able to adequately manage him. And that is another one of the district court's conclusions. Why does it support that inference more than the contrary? It shows that when he's got issues that need care that they can't deliver on the spot, they get him to the care that he needs. In other words, if he were living in the community, he wouldn't get the treatment he needed in his house. He'd have to go to a provider or a hospital. What is the fact that they need to take him to specialists outside of their own facility? Did an expert say that's evidence that he's getting inadequate care there? I think it's a reasonable inference because we know, among other things, he's not getting, he's under dialyzed. That is, his blood is not being adequately cleansed under the FMC Devens regimen. Am I correct that the court both suggested that when he was eligible outside for dialysis, he wasn't doing it? Is that a relevant matter now so much later or what? I don't think so. That's from more than a decade ago. It's certainly a fact of the case, but it predates even the offense. As we pointed out at the hearing, one of the big questions was, can you really trust that Mr. Rodriguez will make use of an opportunity like this? As I explained then, there's a lot of evidence from the record showing that when he had a chance, until he had these chaotic life circumstances, that he did take the opportunity. He had to lose a tremendous amount of weight to qualify. While he was at a provider in Vermont, that provider couldn't do the type of surgery he needed. He found another one in another state at Dartmouth-Hitchcock and got the treatment there. There's a lot to suggest that he would take advantage of this opportunity. We're not here as fact finders or discretion exercisers. I'm trying to figure out, we have to conclude that the record compels the conclusion that his treatment there is inadequate. When I look at his own expert's testimony, she clearly preferred that he get treatment in the community. When asked about it, she said there are competing factors on each side. It acknowledged that he has access to care there. He's going to get there regardless of the weather or other factors. He's got caregivers at the ready. Those were all factors in favor of the inpatient. It just strikes me that if the strongest evidence he can marshal is, there's competing arguments on both sides, but I prefer this one. That's hard to say as a matter of law that that's an error to conclude otherwise. I think the standard clearly is abuse of discretion, but a court abuses its discretion when it bases its finding on clearly erroneous findings of fact. I think the repeated hospitalizations is clearly erroneous. It's a major issue. Mr. Omar Rodriguez wound up in the hospital with a diabetic foot ulcer, infected with antibiotic-resistant bacteria, and his toe was amputated. He's diabetic. Diabetics have problems with certain disorderly issues, and so amputations are not uncommon for diabetics. It's not. So he's at risk. This is supportive of your view, and I would think in a way that his treatment ought to be conscious of that risk that he presents. Let me ask you quickly, you're well over your time, but Judge Reese specifically mentioned the fact that he bought candy at the commissary as some kind of indication that he wasn't concerned about his own health. You counter in your reply brief that there's a document that shows that he was advised to do so. What our point is, and it's a two-part response to the government's argument, broader argument, that he wasn't compliant, that he wasn't doing everything. He wasn't taking advantage. According to him, according to a document? Yes. He would say that he's been advised, and there is, in fact, one of his treatment notes, actually there's more than one, that reflects him telling the provider that, look, I've been told by other medical personnel here to have either candy or salty foods on me in case I experience low blood sugar or low blood pressure. He experienced an insulin shock episode such that he needs to take a glucose quickly. He needs to get sugar, yes, yes. Thank you. Thank you. Thank you. Ms. Smith. May it please the Court, Corinne Smith on behalf of the United States. The district court did not abuse its discretion in its evaluation of the defendant's arguments as the extraordinary and compelling reasons for a sentence reduction. There is ample record support for each and every one of the district court's findings that the defendant takes issue with. As to the repeated hospitalizations, the court reasoned that it could not find recent evidence of hospital discharges in the record, and it confirmed that reading of the record with the defendant's own expert. That discussion is at Joint Appendix 417 to 418. It turned out to be wrong in that it admitted a hospitalization for a toe amputation, which is a fairly significant procedure, and it was inpatient, and he was in for a few days. Does the fact that his expert wasn't able to contradict the sort of tentative finding that the court made in their discussion immunize that, or if it's wrong, is it an error that we need to then evaluate whether it impacted things? Well, there's more context to that point, Your Honor. The district court's finding was that it couldn't find evidence of recent hospitalizations, but if they had happened, they were not prolonged, and that is not contradicted by the record. The hospital stayed for the toe amputation. Well, I don't know what is prolonged. I mean, five days and a toe. One gets the sense of the district court, whether through its own speediness or through information that was on the record, treating this rather casually rather than giving it full weight. And now my question is you have a very good judge, but you have a sense reading this record that he may not have seen all that was going on, and the question I have in such situations, isn't it appropriate to let that judge think about it again without saying you made an error, without saying anything, but just as I suggested to Jacobs in remand, saying here's what we found is now a record. Look at it and decide whether this is a case. Why isn't that a sensible thing to do? I don't think that that is appropriate in this case, Your Honor, because the district court was well aware of the toe amputation. That was discussed in the first hearing that the defendant had on compassionate release. It was looking at hospitalizations that were more recent than the toe amputation and didn't see any, and if so, it accounted for the possibility of hospitalizations in that time period, but noted that they were not prolonged. I don't think it's an abuse of discretion to call a four-day hospitalization not prolonged. The defendant- Well, but I'm asking something a little bit broader, and saying if the district judge really was on top of it, then the district judge will make the same ruling, give us an answer on the Jacobs in remand, and that will be that. But if there is a significant chance that this good judge, because of the information that he had before him, decided in a way that he might not have decided, had he had more, should we go out of our way to send it back, or is that too much work, too much- You keep coming back on the facts. It's not abuse of discretion. Okay, but I'm just asking, does it make sense? It does not make sense to remand in this case, Your Honor. As I said, there is ample record support for all the district court's findings. As Judge Robinson pointed out, the 3553A prong of the inquiry, this court has said in Fleming, is an independent basis for a denial of relief. And so the court need not focus- Now, 3553 is an independent basis, but if the information was incorrect, then that too would be subject to a question. We submit, Your Honor, that the information was not correct. There were not recent prolonged hospital stays, but that is not the only thing that the district court made findings on for which there was basis in the record. Right, but the question that it raises for me, and I wasn't offering that as an opinion so much as I was trying to figure out whether the 3553 analysis stood on its own independent of the- if there were clear errors in the fact findings. And I guess I'm wondering whether- I think there's a compelling argument that 3553 is by definition of balancing, and where the court has just laid out all the analysis on the medical side, we can infer that the court's 3553 analysis reflects a balancing in whatever the court found on the medical side with these other factors, including the analysis of the crime. And so I just want to give you a chance to tell me I'm wrong about that, that the 3553 can somehow stand, even if these are errors. And I understand you don't agree that they are. Yes, I think it can, Your Honor. In Halvan, this court noted the broad discretion that a district court has on motions for compassionate release, and stated that this court cannot require that the district court give determinative or dispositive weight to any one factor. And the court's 3553A analysis did take into account a broad set of facts, including the callousness, heinousness, vindictiveness, violence of the crime, the history and characteristics of the defendant, including the medical conditions, the fact that he had them at the time of the offense, they were considered- But if the court's determination rests on an erroneous fact finding, then that would be, unless we conclude that it's sort of an erroneous fact finding that wouldn't have in any event had any impact on the court's analysis, given what the court said. But given that the only factors the court discussed were the medical situation and the heinousness of the crime, it's hard for me to think that the medical findings weren't significant in the court's 3553 analysis. The court also discussed and credited Mr. Rodriguez for his rehabilitation efforts. It noted that his disciplinary record was very good, and it described his rehabilitation as significant. But then its 3553A analysis was, I think, heavily focused on the nature of the offense, the fact that the defendant was sick at the time he committed it, the fact that it was a deliberative act that required planning, that he had ample opportunity to help the victims and did not. But I don't think that there is basis to conclude that there is clear error of factual findings here. If I could turn back to the health issues, the discussion about the extent to which the defendant complied with medical advice is incomplete in that there are ample instances in the record where the defendant was not complying with advice. As to the sugar, the only thing that I found in the record that says that he was advised to purchase sweets is the defendant's own statement that was taken down in clinical assessment notes. That is in the record below at docket 225 at page 248. That same assessment says that he said he was advised to purchase candies and salty food. I, the clinical assessment, says I again emphasize that his commissary choices undermine efforts to control his sugars and manage his fluid status. I again advised him to please follow the instructions of the dietician who sees him regularly. And I asked him again to contact only her with questions about appropriate purchases. And then there are two separate visits in 2020 where he's given nutrition counseling on buying foods with added phosphorus and how added phosphorus counteracts some of the medications he's taking. Those assessment notes say inmate has been educated multiple times about the importance of limiting high-phosph foods or those with phos additives. Commissary lists reviewed multiple items with phos additives pointed out to him. Inmate not receptive to nutrition counseling will continue to seek teachable moments. That's at Joint Appendix 47. And then two months later, there's another visit where the notes say needs reinforcement of dietary education. Excess mineral intake phos related to poor food choices. Reviewed how certain meds are ineffective against added phosphorus. Inmate states understanding poor compliance anticipated. That's at Joint Appendix 55. And then there are a couple of sets of notes about his failure to comply with the advice to wear certain medical shoes to protect his toe. That's at Sealed Appendix 38 and 37. His expert also noted that in the time he's been incarcerated, he was turned down for a transplant in part due to failure to comply with medical advice. That's at Joint Appendix 418 to 19. The discussion about his level of blood clearing, his expert attributed that difficulty in part to his physical characteristics. It described in defendant's brief, he suggests that the expert was saying that his blood cleaning levels was not meeting the, quote, very standard Medicare requirements. That takes the expert's statement out of context. The expert was describing as very standard the method of measuring blood cleaning. And she noted that the defendant was often not meeting it, but she attributed that to physical characteristics such as a fistula issue, dialysis access problems, and blood clotting. She also noted his expert that she had never observed him in the community and could not speak to whether he would comply with medical advice and get himself to dialysis were he released. And the record of his compliance while he's been incarcerated does not, should not give the court any confidence that he would comply with medical advice out in the community. All that is showing that there was plenty of ground for the court to come out the way it did. The question is, were there other grounds the other way that the court didn't fully appreciate? I mean, you've given us, you know, it's all there, and we read it all, and there were those grounds. There's no doubt about it. The question is, how does that deal with the things that the court didn't quite get? Your Honor, respectfully, I don't think that there are things the court didn't quite get. No, I don't. You've told us. It looked at the hospitalizations. It was aware of the toe amputation. It explored those questions in detail with the defendant's own expert. It gave careful consideration to every argument the defendant brought forward, and it concluded that, you know, two independent conclusions, there were not extraordinary compelling reasons, and even if there were the 3553A factors specifically pointing to the nature of the offense, did not support a sentence reduction. Thank you. Mr. Johnson. Thank you. We agree that the two parts of the analysis inform each other, that they balance, they complement each other, and that remand makes an abundant amount of sense for several reasons. There are clear indications of error or overlooking of evidence, and this is someone who is among the sickest people in the BOP. It is literally his life. It's not a serious burden. It's not a multi-day or week trial. Can I ask, though, you've outlined, we focused a lot on the hospitalizations and the toe procedure. I'm trying to figure out what other things the district court said that might have been clear error rather than an interpretation of the evidence. And so the terminal bit is tough, right? You've got, I think, a very nuanced argument as to why, I mean, I suppose at some level we're all terminal, right? Terminal is never actually defined, so I don't know what everyone believes themselves to be saying. But given that their own experts said he's not terminal, I understand there's a more nuanced argument to be made. But can we say it's clear error for the district court to essentially embrace the very clear statement of his own expert that he's not terminal? When the clear statement is not the whole statement, yes. I think that the rest of what our expert, what Dr. Kinzel said, is crucial. That is, people with end-stage kidney disease are going to die if they don't get a kidney or dialysis. You have a limited amount of time on dialysis, both to live at all but also to be healthy enough to qualify for a kidney. And Mr. Rodriguez has been on dialysis for more than a decade. And he has a limited amount of time. We're not asking for immediate release. We're asking for a reduction so that he has some opportunity. I mean, that almost feels inconsistent to me, right? If he's got a limited amount of time and the theory is that the only way he's going to get a transplant is to get into the community because we believe he's going to become eligible more readily under treatment in the community. Wouldn't that be a reason that you say he needs to be released right away? Possibly, but as the court has said, the two parts of the equation balance one another. So there's the urgency of the medical situation and there's the other 3553A factors, including the crime. It was undoubtedly a serious crime. It strikes me that the heart of your theory is that he's more likely to improve to the point that he qualifies for a transplant if he's under treatment in the community. He's getting home dialysis. And he's got a limited amount of time, and that's the basis. And if not, he's ultimately going to die sooner than he otherwise would because he didn't get the transplant. Yes. Is that a- I'm trying to summarize it. A clear summary. One of the things that I was struggling with is that the expert didn't say those things. The expert dropped little bits here and there, and now we're being asked to connect those sort of as a matter of law. I mean, I saw the expert as saying she thinks he'll do better in the community, but there's arguments on both sides. And she doesn't say they don't have the capability of providing dialysis, which is one of the two things that people with end-stage renal disease need. I'm just trying to figure out- Let me be clear. FMC Devins provides dialysis. I think it's clear that they will, I don't think, ever provide home dialysis, you know, a unit in your cell with large meagles, unsupervised. And we don't even know if he would get home dialysis if he were released. We know that that's a thing that's happening out there, but we don't know if it's available where he would go, or do we? I think we do know that his provider in the past was- I'm going to get their name wrong, but Fresnius. It's in his PSR. They're still in the St. Johnsbury area. They do home dialysis. Yes, somebody would have to write up a prescription and actually prescribe it, but, you know, given the many factors at issue here, including, you know, he's a very large guy, you know, doing dialysis three times a week is not terribly efficient. You know, if you can do it every day, you know, while you sleep, that's better. Tell me again how old he is. I believe he's 46. I just looked. Very, very young. He is quite young, yes. Yes. Unless the court has any other questions. Thank you very much. Appreciate you all coming down from Vermont. We should have been here together. Thank you, Attorney. And- We're all here from outside. That's right, the outsiders panel. Appreciate your arguments, and I guess that concludes this morning's arguments, so thank you. The court stands adjourned.